UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**NORA E. ROBLES,**

**Plaintiff,**

**v.** **Case No. 25-C-122**

**MANITOWOC PUBLIC SCHOOL DISTRICT,**

**Defendant.**

---

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Nora E. Robles, proceeding *pro se*, filed this action against Manitowoc Public School District (MPSD) alleging employment discrimination on the basis of her race, color, and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. This Court has jurisdiction under 28 U.S.C. § 1331. The matter comes before the Court on Defendant's motion for summary judgment. For the following reasons, Defendant's motion will be granted.

## PRELIMINARY MATTERS

To start, the Court notes that many of Plaintiff's responses to Defendants' proposed findings of fact (PFOF) do not comply with Civil Local Rule 56. That rule requires "a concise response to the moving party's statement of facts." Civil L.R. 56(b)(2)(B). The problem with Plaintiff's responses is that they can hardly be considered responses to Defendant's proposed facts. For example, Defendant's PFOF 4 states: "Robles signed her teacher contract on August 5, 2021." Dkt. No. 65 ¶ 4. Plaintiff responds by "admit[ting] in part and deny[ing] in part." In full, her response states:

> Plaintiff does not dispute that her employment ended after the 2021–2022 school year. Plaintiff disputes any characterization that the termination of the employment relationship resulted from a wholly voluntary decision independent of Defendant's contemplated nonrenewal and the events and working conditions preceding the resignation. The contemporaneous union notes state that on March 16, 2022, Principal Lee Thennes was recommending nonrenewal and reflect discussion of whether Plaintiff could negotiate a resignation. Defendant also acknowledges that Plaintiff's resignation form identified the resignation as being "in lieu of contract nonrenewal."

Dkt. No. 77 ¶ 4 (internal citations omitted). In the entirety of her response, Plaintiff never addresses whether she signed a teaching contract or when she did so. Another example is Defendant's PFOF 42, which states: "Neither Ms. Berth nor Mr. Ruechel taught during the 2021–2022 academic year without a license, and there is no evidence in the record suggesting the District 'endorsed' them for licensure." Dkt. No. 65 ¶ 42. In response, Plaintiff states: "Plaintiff's comparison is not limited to whether Berth or Ruechel possessed exactly the same license or used precisely the same statutory route. Plaintiff relies on differences in assistance, treatment, access to licensing pathways, observations, and administrative support." Dkt. No. 77 ¶ 42. This response does not address the proposed fact and instead provides an argument in support of Plaintiff's position. Non-responsive responses such as these do not satisfy Civil Local Rule 56, and therefore several of Defendant's proposed facts will be accepted for purposes of this motion. *See* Civil L.R. 56(b)(4) ("The Court will deem uncontroverted statements of material fact admitted solely for the purpose of deciding summary judgment.").

The Court also notes that Plaintiff's declaration is in several instances insufficient to create a genuine dispute of material fact. The Seventh Circuit has summarized the law on this issue well:

> A nonmoving party's own [declaration] can indeed be "a legitimate method of introducing facts on summary judgment." *McKinney v. Office of Sheriff of Whitley Cnty.*, 866 F.3d 803, 814 (7th Cir. 2017) (citation omitted). Evidence "presented in a 'self-serving' affidavit or deposition is enough to thwart a summary judgment motion," unless it fails to meet the usual requirements of any other form of evidence at the summary judgment stage. *Kellar v. Summit Seating, Inc.*, 664 F.3d 169, 175 (7th Cir. 2011) (citation omitted). While it is true that courts should generally not

> make credibility determinations at the summary judgment stage, *McCottrell v. White*, 933 F.3d 651, 657 (7th Cir. 2019) (citation omitted), a nonmoving party at the summary judgment stage cannot rest "upon conclusory statements in affidavits; [they] must go beyond the pleadings and support [their] contentions with proper documentary evidence." *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021) (citation omitted). Mere speculation cannot "be used to manufacture a genuine issue of fact." *Id.* (citation omitted).

*Foster v. PNC Bank, Nat'l Ass'n*, 52 F.4th 315, 320 (7th Cir. 2022). Here, several of the facts Plaintiff attempts to establish in her declaration are not supported with proper documentary evidence. For example, paragraph 8 of her declaration states:

> I did not receive a completed PI-1624-LS1 from MPSD on August 31, 2021. The August 31 communication contained links and an incomplete or blank attachment rather than a PI-1624-LS1 completed by the District. I received a completed PI-1624-LS1 from MPSD on February 14, 2022.

Dkt. No. 78 ¶ 8. In support of this statement, she cites Exhibit H of Lee Thennes's declaration and Exhibit A to her own declaration. Exhibit H of Lee Thennes's declaration shows that the August 31, 2021 email from MPSD *did* include a link and a completed PI-1624-LWS1 form. Dkt. No. 67-8. Exhibit A of Plaintiff's declaration does not discuss the August 31, 2021 communication at all. Another example is paragraph 11 of her declaration, which states that "MPSD did not provide [Plaintiff] with a completed PI-1624-LS1 until February 14, 2022." Dkt. No. 78 ¶ 11. The exhibits Plaintiff cites in support of this statement show that MPSD sent Robles the PI-1624-LS1 on February 14, 2022, but they do not show this was the first time that document was sent to her. These conclusory statements and speculation are not enough to create a genuine issue of material fact. With these preliminary matters sorted out, the Court proceeds to the facts of this case.

## BACKGROUND

Defendant MPSD, a public school district organized under and subject to Wisconsin law governing public school districts, hired Plaintiff Nora E. Robles on August 5, 2021, to teach English as a Second Language (ESL) at Lincoln High School (LHS) for the 2021–2022 academic

year. Dkt. No. 81 ¶¶ 1–4. Her teaching contract, Manitowoc Board of Education policies, and Wisconsin statutes required Robles to hold a valid Wisconsin teaching license or certificate to teach ESL at LHS. *Id.* at ¶¶ 7–11. Obtaining a teaching license in Wisconsin is the responsibility of the individual educator. *Id.* at ¶ 22.

Wisconsin law provides for four tiers of teaching licenses. Wis. Admin. Code PI § 34.026(3). Tiers I and II include licenses of a limited duration, while Tiers III and IV include licenses with no expiration date. *Id.* Most relevant here is the Tier I 1-year renewable license with stipulations (LWS1). Aside from interns coming from educator preparation programs, an applicant can be eligible for an LWS1 either through an approved program or the need of a school. *Id.* § 34.028(2). To be eligible through an approved program, an applicant must have completed all of the coursework at an approved program and hold a bachelor's degree. *Id.* To be eligible by school need, the following requirements must be met: the applicant must hold a bachelor's degree or higher from an accredited college or university; the employing school district, CESA, charter school, or private school must have conducted a search for a fully licensed candidate and no fully licensed candidate was acceptable for the assignment; and the administrator of the school must have submitted a written request to the state superintendent on behalf of the applicant. *Id.* Once an applicant receives an LWS1, it is valid for one year. *Id.* § 34.028(3).

Aside from licenses in special education, an applicant can seek renewal of an LWS1 without limitation. *Id.* § 34.039. For renewal to occur, the district administrator of the employing school district must request renewal. *Id.* § 34.028(4). Additionally, one of three things must occur during the term of the license: (1) if the license holder is eligible by school need, the license holder must be enrolled in an approved program and successfully complete at least 6 semester credits or equivalent; (2) if the license holder is eligible through an approved program or by school need and

completed all of the coursework in the approved program, the license holder must attempt to complete all of the tests required for licensure; or (3) if the license holder is eligible through an approved program or by school need and does not satisfy either (1) or (2), the district administrator may submit to the state superintendent a written plan that demonstrates, by clear and convincing evidence, that the license holder will complete all of the licensure requirements. *Id.*

With that background in mind, the Court proceeds to the matter at issue here. Despite needing a license to teach, at the time MPSD hired Robles, she did not hold a lifetime teaching license and had not yet obtained another license qualifying her to teach ESL at LHS. Dkt. No. 81 ¶¶ 5, 12. Robles was aware of the license requirement and had previously held two 1-year emergency teaching licenses and three LWS1s. *Id.* at ¶ 6. To teach at LHS, Robles needed to renew her LWS1 for the subject of ESL. *Id.* at ¶ 12. Thus, just before Robles signed her contract to teach at LHS, MPSD submitted an inquiry to the Wisconsin Department of Public Instruction (DPI) about Robles renewing her LWS1 to teach ESL. *Id.* at ¶ 13. In their response, which was consistent with Wisconsin statutes, DPI noted that there were several requirements for the renewal of Plaintiff's LWS1. *Id.* at ¶ 14; Dkt. No. 68-7. First, the employing school district would need to fill out a PI-1624-LWS1 form for the applicant to submit, which would serve as the district request for renewal. Dkt. No. 81 ¶ 15; Dkt. No. 68-7. Second, the person seeking the license would need to provide a PI-1624-PROG form, which was to be completed by a certification officer at an approved program. Dkt. No. 81 ¶ 15; Dkt. No. 68-7. Third, the person seeking the license would have to show that they are either (1) enrolled in an approved program and completing credits, (2) attempting the test that is preventing licensure, or (3) that the district would be requesting an exception by submitting a written plan. Dkt. No. 68-7.

As for the first requirement, MPSD sent Robles a completed PI-1624-LWS1 form by email on August 31, 2021 and February 14, 2022. Dkt. No. 81 ¶ 17; Dkt. No. 68-8; Dkt. No. 68-9; Dkt No. 38-1 at 1. For the second requirement, Robles went through the teaching program at the University of Wisconsin-Green Bay (UWGB), so that program needed to provide the PI-1624-PROG form. Dkt. No. 81 ¶ 16. UWGB, however, could not fill out this form endorsing Robles because she had not passed the Foundations of Reading Test (FoRT). Dkt. 78-1 at 3. Because she had not passed the FoRT, she was not eligible for an EC-MC regular education license, which would authorize her to teach individuals from birth to age 11. Dkt. No. 68-10 at 6; Dkt. No. 81 ¶ 32. Only if UWGB issued this regular education license could they issue an ESL license as an add-on or supplementary license.[1] Dkt. No. 78-1 at 2; Dkt. No. 81 ¶ 32. Therefore, although Robles had completed the course requirements for both an EC-MC regular education license and an ESL license, UWGB could not endorse her for either due to her failure to pass the FoRT. Dkt. No. 81 ¶ 32. If Robles wanted to be licensed as an ESL teacher only, UWGB instructed her that she would have to enroll in another program which offered it as a stand-alone license. *Id.*

Robles knew she needed to pass the FoRT to obtain the licenses she was requesting from UWGB. On August 31, 2021, Robles stated in an email that she was not yet licensed because she "was learning new material to go and take the test," where she was referencing the FoRT. *Id.* at ¶ 24; Robles Dep. Ex. 1, Dkt. No. 66-1 at 49. She also stated in her deposition that in August of 2021, she told MPSD that "what [she] need[s] is to take the FoRT test." Robles Dep. 27:11–12. Despite her knowledge of this requirement, Plaintiff never took this test during the 2021–2022

---

[1] It is unclear whether, if she had passed the FoRT, UWGB could have endorsed Robles for a K-12 ESL teaching license, or whether any ESL teaching license they might have endorsed as an add-on would have been only for birth to age 11. *Compare* Dkt. No. 81 ¶ 35 *with* Dkt. No. 81 ¶ 34. Either way, because Robles had not passed the FoRT, UWGB could not endorse her for an ESL license.

school year. Dkt. No. 81 ¶ 26. There is also no evidence she enrolled in a program to obtain a stand-alone ESL license. Dkt. No. 66-2.

Robles, MPSD, UWGB, and DPI continued to be in communication about her license throughout the school year. Dkt. No. 81 ¶ 28. On February 4, 2022, MPSD reached out to DPI stating that they were concerned about Plaintiff's license because she applied for it on November 7, 2021, and it still had not been issued. *Id.* at ¶ 29. DPI responded, explaining that Robles submitted the incorrect application and that they emailed Robles to clarify but had not yet received a response. *Id.* at ¶ 30; Robles Dep. Ex. 3, Dkt. No. 66-1 at 58. On March 15, 2022, DPI contacted Robles and stated that an additional form was required for the LWS1 she requested—the PI-1624-PROG form, which was to be completed by UWGB. Dkt. No. 82 ¶ 8; Dkt. No. 68-10 at 1. That email also stated that Plaintiff's employing school district could request an exception if she had not made progress toward the K-12 ESL license. Dkt. No. 68-10 at 1. On March 25, 2022, DPI was in contact with Robles and told her that they "need[ed] evidence of what [she was] doing to obtain a [stand-alone] K-12 ESL license." Dkt. No. 81 ¶ 33. On May 27, 2022, near the end of the 2021–2022 school year which Robles was hired for, DPI contacted Robles and clarified that she was only eligible for the LWS1 for K-12 ESL if she provided "evidence [she was] enrolled in an EAA or K-12 ESL program to complete the requirements for [the] license." Dkt. No. 81 ¶ 36.

In sum, to obtain the LWS1 she was seeking, Robles either needed to show she was enrolled in a program to complete the license requirements or that she was attempting to retake the test required for licensure. She did neither. The only other option was for the district to request an exception, which would require them to submit a written plan showing by clear and convincing evidence that the license holder would complete all of the licensure requirements. There is no

evidence that MPSD requested such an exception, nor is there evidence that they had the necessary information to request it.

Despite not yet having the required license, Robles continued to work for MPSD throughout the 2021–2022 school year. In her role at LHS, Plaintiff frequently interacted with the other ESL teachers at LHS, Catherine Berth and Benjamin Ruechel. Dkt. No. 81 ¶ 40. Both Berth and Ruechel had worked for MPSD for three years and held a lifetime license authorizing instruction in ESL for early adolescence to adolescence. *Id.* at ¶ 41. Additionally, neither Berth nor Ruechel had any history of performance or disciplinary issues while employed by MPSD. *Id.* at ¶ 44.

Robles, on the other hand, did have performance and disciplinary issues. Throughout the school year, MPSD formally discussed with Robles the following:

1. The need to work in a collegial and collaborative manner with all members of the LHS learning community;
2. The need to refrain from talking with students about colleagues;
3. The need to consistently engage with all members of the LHS learning community in a professional and respectful manner;
4. The need to have self-awareness as to how her words and actions impact others; and
5. The need to take ownership of areas of personal growth and development.

*Id.* at ¶ 47. MPSD also issued a Teacher Performance Improvement Plan (PIP) and met with Robles on January 5, 2022 to discuss it. *Id.* at ¶ 48. On February 14, 2022 and February 17, 2022, MPSD had check-ins with Robles regarding the PIP. At both of those check-ins, Robles reported that there was improvement in her relationships with both students and colleagues. Dkt. No. 66-3 at 2–4; Dkt. No. 82 ¶ 17–18. At a later check-in on March 10, 2022, Robles noted that her Caucasian colleagues did not want to hear from her as a person of color and did not like when she came up with innovative strategies. Dkt. No. 66-3 at 4–5; Dkt. No. 82 ¶ 19. She also expressed that the complaints colleagues had about her were due to cultural differences, that she felt targeted,

and that her colleagues were sensitive due to white fragility. Dkt. No. 66-3 at 4–5. At this same check-in, in contrast to Plaintiff's self-reported improvement, Principal Thennes noted that the "concerns that drove the development of the plan[] continue to be an issue." Dkt. No. 66-3 at 4. Robles also submitted a rebuttal to the PIP on March 24, 2022, where she claimed that she checked her emails for tone before sending them, that she let her colleagues and students know about her absences and how to find assignments while she was gone, that she felt she needed to advocate for students enduring physical and verbal abuse she witnessed, and that several alleged mistakes she made while proctoring students taking the ACT and setting up parent-teacher conferences could be explained. Dkt. No. 66-3 at 7–9; Dkt. No. 82 ¶ 20. Overall, although she signed the PIP, Plaintiff noted that her signature merely acknowledged receipt and did not indicate agreement with its contents. Dkt. No. 82 ¶ 21.

In addition to the PIP, Robles was frequently involved in disputes with staff and students at LHS. Between October and December of 2021, MPSD met with Robles at least four times regarding incidents raised by other staff about her unprofessional conduct. Dkt. No. 81 ¶ 55; Dkt. No. 82 ¶¶ 11–14. On February 10, 2022, Robles emailed Principal Lee Thennes alleging a colleague had engaged in inappropriate physical contact with students. Dkt. No. 81 ¶ 49. After investigating Plaintiff's complaint, MPSD determined the allegations were not substantiated. *Id.* at ¶ 50. Plaintiff made a similar allegation on April 6, 2022, though the facts surrounding the incident are disputed. Plaintiff claims that she witnessed an incident involving Berth and two newcomer students at LHS where the two students were unable to communicate and she stepped in to translate for them. Dkt. No. 82 ¶¶ 26–28. The situation escalated to a verbal confrontation between Berth and Robles. *Id.* at ¶ 32. Just after it occurred, Plaintiff reported the incident to her union representative and both Plaintiff and Berth were sent home for the day. *Id.* at ¶¶ 31, 33.

Possibly motivated by the disputes with her colleagues, Plaintiff claims she frequently requested formal and informal classroom observation, acknowledgment, and feedback. *Id.* ¶ 36. Plaintiff states that, despite her requests, MPSD administrators never observed her classroom teaching during the 2021–2022 school year. *Id.* at ¶ 39. Defendant disputes these facts. *Id.* at ¶¶ 36, 39.

MPSD ultimately notified Robles that it would recommend to the Board of Education nonrenewal of her contract for the 2022–2023 school year. Dkt. No. 81 ¶ 52. After being informed of this proposed recommendation, Robles elected to resign from her position. *Id.* at ¶ 57. She did so, at least in part, relying on the advice of her union representative. *Id.* at ¶ 65. She submitted a resignation letter on April 4, 2022, indicating her intent to resign on June 9, 2022. *Id.* at ¶ 58. She also signed a separation agreement with MPSD, where the district agreed to write Robles a positive letter of recommendation. Dkt. No. 19-4; Dkt. No. 81 ¶¶ 62–64. The separation agreement also stated that Robles forewent her statutory rights under Wis. Stat. § 118.22, which permits teachers whose contracts will not be renewed for an upcoming school year to request a private conference with the school board. Dkt. No. 19-4; Dkt. No. 81 ¶ 57.

After her resignation, Robles sent a strongly worded email to a colleague, stating that the colleague was "the teacher that does not know how to treat or communicate efficiently with minorities." Dkt. No. 81 ¶ 66. Plaintiff also stated in the email that she was attempting to advocate for students. Dkt. No. 82 ¶ 56. After this email was sent, MPSD escorted Robles out of the school and barred her from returning to the classroom for the remainder of the school year. Dkt. No. 81 ¶ 69; Dkt. No. 82 ¶ 44. While being escorted, she attempted to seek union assistance but was prohibited from doing so at that point in time. Dkt. No. 82 ¶¶ 47, 58. Despite this incident, Robles was instructed to submit student progress reports to ensure educational continuity and avoid

disruption to students' education. Dkt. No. 81 ¶ 70. She was also paid all wages and benefits to which she was entitled through the end of her contract. *Id.* at ¶ 71.

Robles filed this action on January 23, 2025. Compl., Dkt. No. 1. The matter comes before the Court on Defendant's Motion for Summary Judgment. Dkt. No. 63.

## LEGAL STANDARD

Summary judgment is proper when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citation omitted). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (internal quotation marks and citation omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Stated differently, summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999); *see also Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004) ("The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal."). Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear

the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp.*, 477 U.S. at 322).

**DISCUSSION**

Plaintiff asserts a variety of discrimination and retaliation claims under Title VII. First, she claims MPSD discriminated against her by failing to assist or support her in obtaining her teaching license. Dkt. No. 1-1 at 2–3. Next, she claims she was subject to a hostile work environment because she was not provided important information relevant to her job, was treated poorly by MPSD staff, was yelled at and micromanaged, was isolated from her colleagues, and was subject to public humiliation after a situation was needlessly escalated. *Id.* at 3–5. Her third claim is that she was forced to resign from LHS due to proposed non-renewal of her contract, the hostile work environment, and her discriminatory treatment. *Id.* at 4. Finally, Robles claims MPSD retaliated against her for advocating for ESL students and their needs and for complaining of unequal treatment by placing her on a PIP. *Id.* at 3–4.

**A. Discrimination**

Title VII prohibits employers from discriminating against any individual because of their race, color, or national origin. 42 U.S.C. § 2000e-2. At summary judgment, the ultimate question is "whether the evidence as a whole 'would permit a reasonable factfinder to conclude that the plaintiff's [race, color, or national origin] caused the discharge or other adverse employment action.'" *Brown v. Chi. Transit Auth.*, 179 F.4th 577, 588 (7th Cir. 2026) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). With this simple question in mind, the court turns to the instances of discriminatory conduct to which Plaintiff claims she was subjected.

**1. Failure to Assist with Licensing**

Plaintiff first brings a disparate treatment claim against MPSD, alleging that they failed to assist her with obtaining the license necessary to teach ELS at LHS. "To establish a Title VII disparate treatment claim, a plaintiff must allege that an employer took job-related action against him which was motivated by intentional discrimination." *Alamo v. Bliss*, 864 F.3d 541, 552 (7th Cir. 2017). Plaintiff's claim that MPSD failed to assist her with her licensing fails for several reasons.

First, MPSD never took any adverse employment action against Robles. The undisputed evidence shows that MPSD fulfilled its obligation with regard to Plaintiff's license—it sent her the form she needed on August 31, 2021 and February 14, 2022. Dkt. No. 81 ¶ 17; Dkt. No. 68-8; Dkt. No. 68-9; Dkt No. 38-1 at 1. Plaintiff admits that MPSD fulfilled its obligation by sending her this form. During her deposition, in response to the question, "If this [August 31, 2021] email did occur, the district's obligation would have been fulfilled?" Plaintiff responded, "If it would have occur[ed], yes." Robles Dep. 40:11–13. The evidence shows that communication did occur, and thus MPSD fulfilled any obligation it had to Robles regarding her licensure.

Second, it is ultimately a teacher's responsibility to pursue and obtain the proper license. Plaintiff claimed in her deposition that she was "clueless on what to do." *Id.* at 34:15. But Plaintiff's confusion surrounding her licensure is not MPSD's fault. She also states she did not need to take the Foundations of Reading Test (FoRT) for a secondary ESL license, and instead that she had to add a major or obtain a secondary license. *Id.* at 34:24–37:8. There is no evidence in the record that she did either of these things. Thus, it was Plaintiff—not MPSD—who did not meet her obligation to obtain her license as required by her contract, MPSD's policies, and Wisconsin statutes.

Lastly, although Plaintiff claims MPSD could have requested an exception, there is no evidence in the record showing that Robles ever asked that they do so. Nor is there evidence that they could have done so if Robles requested it. Requesting an exception would have required MPSD to submit a written plan to the state superintendent showing by clear and convincing evidence that Robles would complete the licensure requirements for an ESL K-12 license. Wis. Admin. Code. § 34.028(4). But the evidence in the record shows no attempt by Robles to obtain the appropriate license. Without any effort on Plaintiff's part, it would have been impossible for MPSD to request an exception for her. Thus, MPSD did not discriminate against Robles by failing to request an exception for her licensure.

No reasonable factfinder could conclude that MPSD failed to assist Plaintiff with her licensing. Therefore, there is no evidence that MPSD took an adverse employment action against Robles sufficient to support a disparate treatment claim under Title VII. Even if a reasonable fact finder could draw the conclusion that MPSD engaged in an adverse employment action, a reasonable jury could not find that MPSD's failure to assist Robles was due to her race, color, or national origin. Rather, the undisputed evidence shows that MPSD attempted to assist her throughout the school year, and any licensing deficiency was the result of Plaintiff's own actions or failure to act. Plaintiff's disparate treatment claim is therefore dismissed.

**2. Hostile Work Environment**

Robles also claims she was subject to a hostile work environment in violation of Title VII. A hostile work environment can constitute an adverse employment action under Title VII. "Specifically, Title VII is violated when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Alexander v. Casino*

*Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (quoting *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005)).

In support of her hostile work environment claim, Plaintiff cites "alleged instructions that colleagues not assist or interact with her, exclusion from relevant communications, differential administrative support, treatment regarding licensing, increased scrutiny, the PIP, office-related treatment, the nonrenewal recommendation, and the circumstances of her separation." Pl.'s Br. at 25, Dkt. No. 79. In response, Defendant argues that any alleged hostile work environment did not occur because of her race, color, or national origin. Rather, it arose from interpersonal conflicts with her coworkers and workplace disagreements. Def.'s Br. at 15, Dkt. No. 64.

Even assuming the evidence Robles presents is enough to show a hostile work environment (which is unlikely), Robles cannot produce evidence linking that work environment to her race, color, or national origin. As noted above, MPSD documented Plaintiff's frequent disagreements with her colleagues and unprofessional behavior throughout the school year. These occurrences, rather than Plaintiff's race, color, or national origin, are what led MPSD to implement the PIP, subject Robles to scrutiny, restrict her from interacting with certain colleagues, move her office, and recommend nonrenewal of her contract. Plaintiff presents no evidence that the actions were race-based. Indeed, the record contains "not a single racially offensive remark, email, or other hint of racial animus." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016). Thus, summary judgment is also granted on Plaintiff's hostile work environment claim. *See id.* (finding that summary judgment was appropriately granted on plaintiff's hostile work environment claim because any alleged threats, humiliation, or interference with plaintiff's job "stemmed from his own failure to meet legitimate employment expectations").

### 3. Forced Resignation

Plaintiff also claims she was forced to resign from her position at LHS because the school was going to recommend non-renewal of her contract and she was subject to a discriminatory work environment. In other words, plaintiff claims she was constructively discharged, which constitutes an adverse employment action in violation of Title VII. The Seventh Circuit recognizes two methods of proving constructive discharge. The first method requires the plaintiff to present evidence of "a discriminatory work environment even more egregious than the high standard for hostile work environment." *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1119 (7th Cir. 2022) (internal quotation marks and citation omitted). The second method requires that the plaintiff show "she was forced to resign because her 'working conditions [became] so intolerable that a reasonable person would have felt compelled to resign.'" *Id.* (quoting *Stamey v. Forest River, Inc.*, 37 F.4th 1220, 1225 (7th Cir. 2022)). "Working conditions become intolerable when an 'employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the [ ] employee resigns.'" *Id.* (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008)).

Even if Plaintiff could show that she was subject to an egregiously discriminatory work environment or that the recommendation of nonrenewal communicated that she would be terminated, which again is unlikely, Robles would not be able to show that these things were caused by her race, color, or national origin. As the Court has noted, MPSD had serious concerns regarding Plaintiff's performance. Throughout the school year, MPSD documented instances of Plaintiff's unprofessional conduct and saw little to no improvement after bringing these concerns to her attention. Thus, Plaintiff's constructive discharge claim fails as well.

**B. Retaliation**

Plaintiff's remaining claim is that MPSD retaliated against her for advocating for ESL students and their needs by placing her on a PIP. "Title VII prohibits employers from 'retaliating against an employee for opposing or participating in an investigation of an unlawful employment practice.'" *Pratt v. Wis. Aluminum Foundry*, 183 F.4th 541, 556 (7th Cir. 2026) (quoting *Lewis v. Wilkie*, 909 F. 3d 858, 866 (7th Cir. 2018)). As with Title VII discrimination claims, the core question is simple: "could a reasonable trier of fact infer retaliation . . . ?" *Id.* (quoting *Castro v. Devry Univ.*, Inc., 786 F.3d 559, 564 (7th Cir. 2015)). Making that showing requires evidence of three elements: (1) that the plaintiff engaged in protected activity; (2) that the plaintiff suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action. *Id.* (citing *Gnutek v. Ill. Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023)).

As to the first element, Robles argues that her advocacy for students and their needs, as well as her complaints of unequal treatment, were the protected activities that she engaged in. As Robles admits, "advocacy for students, standing alone, is not [a] protected activity under Title VII[]." Pl.'s Br. at 12, Dkt. No. 76. Nonetheless, Plaintiff's evidence showing she informally complained of discrimination on the basis of her race is a protected activity sufficient to satisfy this element. Dkt. No. 78-1 at 5 ("I am the only Hispanic teacher in your building and for some reason no matter how hard I work, and the dedication I show towards my teaching and students, I have never received a single word of praise but lots of instances of rejection and prejudice from your end."); *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 677 (7th Cir. 2011) ("[A]n informal complaint may constitute protected activity for purposes of retaliation claims.") (internal quotation marks and citation omitted).

As to the second element, Robles claims that the creation of the PIP, continued administrative scrutiny, office-related changes, and the recommendation of nonrenewal constitute adverse employment actions. An adverse employment action is "a materially adverse change in the terms and conditions of employment [that is] more disruptive than a mere inconvenience or an alteration of job responsibilities." *Alamo*, 864 F.3d at 552 (quoting *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000)). "Not everything that makes an employee unhappy qualifies as adverse action, for purposes of a race discrimination claim." *Johnson v. Johnson & Johnson*, 67 F. Supp. 3d 1001, 1009 (N.D. Ill. 2014). Here, the creation of the PIP, administrative scrutiny, and office related changes do not qualify as "materially adverse change[s]." *Davis*, 651 F.3d at 677 ("Performance improvement plans, particularly minimally onerous ones like that here, are not, without more, adverse employment actions."); *Blackmon v. City of Chi.*, 836 F. Supp. 2d 655, 665 (N.D. Ill. 2011) (finding that Plaintiff's allegation that he was subject to increased scrutiny did not rise to the level of an adverse employment action); *Fields v. Shinseki*, 664 F. Supp. 2d 918, 921 (N.D. Ill. 2009) (holding that "plaintiff's office reassignment . . . falls short of the type of adverse action necessary for Title VII liability"). The recommendation of non-renewal, however, does constitute an adverse employment action. *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 815 (7th Cir. 2015) (finding that an employee "was subject to an adverse employment action in the non-renewal of his contract").

Where Plaintiff's claim fails is the third element—causation. "Title VII retaliation claims must be proved according to traditional principals of but-for causation." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2533 (2013). To show a causal link, plaintiff "must do more than merely point to the temporal link; rather, the plaintiff must put forth other evidence that suggests that the protected activities were related to the employer's decision." *Hall v. Forest River, Inc.*,

536 F.3d 615, 622 (7th Cir. 2008). Here, even aside from Plaintiff's failure to obtain the required license, MPSD was documenting concerns about Plaintiff's job performance throughout the entire 2021–2022 school year, including before her complaint of unequal treatment. The record shows that between October and December of 2021, MPSD met with Robles at least four times regarding incidents raised by other staff about her unprofessional conduct. Dkt. No. 81 ¶ 55; Dkt. No. 82 ¶¶ 11–14; Dkt. No. 68-3 at 1. In addition, MPSD instituted a PIP in early January 2022 and noted in early March that the "concerns that drove the development of the plan[] continue to be an issue." Dkt. No. 66-3 at 4. Those concerns included unprofessional interactions with students, arguing and disagreeing with her colleagues, unwillingness to take ownership where she needed growth and development, and a general pattern of unprofessional behavior. *Id.* at 1. It was these performance-related concerns, as well as her failure to obtain a license, that led MPSD to not recommend renewal of Plaintiff's contract. Dkt. No. 68 ¶ 28 ("After issuing the PIP, Robles's conduct and behavior did not improve, and the District notified Robles it would recommend nonrenewal of her teaching contract to the District's Board of Education."). To be sure, Robles disagrees with MPSD's evaluation of her performance. But "[w]here, as here, the employer contends that the plaintiff's job performance was wanting, the plaintiff must do more than dispute the validity of the employer's criticisms. The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). Even when viewing the facts in the light most favorable to Robles, the record shows repeated attempts to address her performance deficiencies, her failure to correct those deficiencies, and MPSD's recommendation of nonrenewal because of those deficiencies. Robles does not present evidence

of an essential element of a Title VII retaliation claim, causation, so Defendant's motion for summary judgment on the claim is granted.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Dkt. No. 63) is **GRANTED**. The case is dismissed. The clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 6th day of November, 2026.

William C. Griesbach
United States District Judge